# BUFFALO PRESSED STEEL COMPANY

*vs.*

# EDGAR F. KIRWAN.

*Contract—Offer and Acceptance—Construction.*

A letter from a jobber and broker to a manufacturer, "If you care to let the car come forward to be settled for as sold on basis of $70 per ton, less five per cent. commission to us, we to stand all freights and storage charges, you may ship to us," *held* to involve a definite offer, the acceptance of which created a contract.                                                p. 64

The surrounding circumstances may be considered to aid in the construction of a contract, if there is some ambiguity or doubt inherent in the language in the connection in which it is used, but not otherwise.                                   pp. 65, 66

A provision, in a contract by a broker as to the possible sale by him on commission of a carload of merchandise shipped him subject to recall, "we to stand all freights and storage charges," *held,* in view of the circumstances, to bind him for freights and storage charges only on such part of the shipment as was actually sold by him.                                   p. 67

*Decided February 9th, 1921.*

Appeal from the Superior Court of Baltimore City (SOPER, C. J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*J. Purdon Wright,* for the appellant.

*William M. Kerr* and *George Weems Williams,* for the appellee.

OFFUTT, J., delivered the opinion of the court.

The Buffalo Pressed Steel Company is a corporation engaged in the manufacture and sale of steel products at Buffalo, New York. Shortly after its organization in April, 1916, it had on hand an accumulation of steel stock in small plates or pieces which it wanted to dispose of, and on June 5, 1916, it wrote Edgar F. Kirwan of Baltimore, offering to sell him a carload of this stock at $80 a ton. Kirwan, who appears to have dealt in steel products as a jobber and also as a factor and broker, in reply offered to pay $70 a ton for the steel. As a result of further correspondence the steel company sold a small quantity of steel pieces at $80 per ton, which at Kirwan's direction was shipped to a firm in Worcester, Massachusetts, and on June 29, 1916, the company offered to sell Kirwan a carload of these steel pieces at $70 per ton, "net Buffalo." Nothing came of this offer, but on July 7, 1916, Kirwan wrote the steel company a letter in which he said:

> "This will confirm telegram advising that we have not been able to interest anyone in the steel today.
>
> "We think possibly the best method of handling this particular car would be either to ship to Worcester or Boston, and we will then job it out to the best advantage, and it will undoubtedly yield better results this way than in attempting to close it out as a car.
>
> "As we have written you several times, there is comparatively few users of the material that are willing to accept the small pieces, and our experience has been that we have had to educate our customers into using this material, after which there will be no difficulty in keeping you cleaned up.
>
> "If you care to let the car come forward to be setltled for as sold on basis of $70.00 per ton, less 5% commission to us, we to stand all freights and storage charges, you may ship to us in care of Genery Stevens & Sons, Worcester, Mass., or Forest Hill Storage Warehouse Co., Boston, Mass."

Which the steel company on July 10th answered by letter reading as follows:

"We have for acknowledgment your favor of the 7th inst. and wish to advise you that shipment is being made today of the carload of 20 square 22 Ga. steel, to you c/o Genery Stevens & Sons, Worcester, Mass.

"We prefer to do this rather than to unload the steel, and we cannot allow it to stand in the car any longer.

"We trust that you will use your best efforts to see that the entire carload is moved promptly, and remittances made to us.

"We do not want this carload of steel being delivered to you at a price of $70.00 net ton, less 5%, to establish a price precedent.

"We are perfectly willing, however, that you make a 5% commission for all of this steel that you sell for us.

"Under normal conditions, however, we have no trouble in effecting sale of this stock at $80.00 net ton, and this stock is sold to you at $70.00 net, less 5%, only because of other avenues for its disposal being temporarily clogged up."

And on July 13, 1916, Kirwan replying to this letter wrote:

"Your favor of the 10th at hand. Kindly note that our proposition is not a straight-out purchase, but the material will be settled for as sold by us, and the car to remain subject to your orders in case we do not move it as fast as you may desire.

"We, of course, will go to work on it at once and try to have it cleaned up within a few days, but will not accept it as a straight-out purchase to be handled as per our letter July 7."

As a result of this correspondence a carload of steel pieces was shipped on or about July 14, 1916, by the steel company to Kirwan, c/o Genery Stevens & Sons, Worcester, Massachusetts. On July 28th, Kirwan telegraphed the steel com-

pany that he was at "work on the car," and on the same day
that company wrote Kirwan requesting "telegraphic advice
relative to disposition of material shipped to Worcester,
Massachusetts," and on July 29th, Kirwan replied by letter
that he was "still at work on the car" and added this state-
ment:

> "If you will refer to our letter of the 13th you will
> see that we distinctly state that we would not be re-
> sponsible for the car only to extent of disposing of same
> and remitting for account when sold. With this ex-
> planation before you, if you are not willing to leave
> the car in our hands, it is perfectly satisfactory for us
> to have you take charge of same, but if you will leave
> it with us we will do all that we can to remove same
> in the very near future."

The car appears to have remained at Worcester until Octo-
ber 11th, 1916, when Kirwan, upon the request of the
steel company ordered it returned to Buffalo where it
was finally received. Upon its return to Buffalo the steel
company was required to and did pay the freight and demur-
rage charges which had accrued on the shipment. These
charges included a charge for freight from Worcester to Bal-
timore and from Baltimore to Buffalo, although it does not
appear why the car was sent to Buffalo by way of Baltimore
instead of directly as ordered by Kirwan, nor does it appear
what part of the storage and freight charges paid by the steel
company were due to this detour.

After paying these charges, the steel company demanded
that Kirwan reimburse it for such payment and, upon his
refusal, it brought an action against him in the Superior
Court of Baltimore City for the recovery of the amount so
paid by it for freight and demurrage. The case was tried
before a jury which, at the conclusion of the plaintiff's testi-
mony, under the direction of the court, returned a verdict for
the defendant, and from the judgment on that verdict this
appeal was taken.

The appeal presents but a single question, and that is whether the correspondence to which we have referred formed a contract under which the defendant was bound to pay all the freight and storage charges which accrued on the car-load of steel shipped by the plaintiff to him at Worcester, Massachusetts, from the time it was shipped from Buffalo until it returned there, whether he sold the steel or not, and in that inquiry the first point to be considered is whether there was any contract at all between the parties. Before analyzing the correspondence relating to this question we will refer briefly to the rules by which it is controlled.

A contract has been defined as an "agreement which creates an obligation," 13 *C. J.* 237, and such an agreement may be defined as the concurrence of two or more persons in a common intent to affect their legal relations, and for the purposes of this case these definitions may be taken as sufficiently accurate. The agreement referred to must rest finally upon an offer made by one party and the acceptance thereof by the other party to that contract. *Brantly, Contracts,* par. 7. An "offer is a proposal to enter into a contract" (13 *C. J.* 266, also *Bouvier*), and an acceptance is the assent of the party to whom the offer is addressed to its terms. The offer must be certain and definite and the acceptance must "in every respect meet and correspond with the offer." 13 *C. J.* 278; *Brantly, Contracts,* par. 9. That is to say both parties to the contract "must actually give their assent to that proposal and acceptance, be it what it may, which *de facto* arise out of the terms of their communications." 1 *Elliott, Contracts,* par. 26.

The offer in this case is contained in Kirwan's letter of July 7th and is made in the following language: "If you care to let the car come forward to be settled for as sold on basis of $70 per ton, less 5% commission to us, we to stand all freights and storage charges, you may ship to us," etc. In our opinion this was a definite offer on Kirwan's part to sell this steel for the company as its factor or consignee upon certain and definite terms. The only part of the offer about

which there could be any doubt is the phrase "we to stand all freights and storage charges," and that, when taken in connection with the surrounding circumstances, is definite enough. This offer was accepted by the appellant in its letter of July 10th. It is true, in that letter the steel company refers to the carload of steel as having been *sold* to the appellee, but elsewhere in the letter it clearly recognized the fact that the steel was not sold to the appellee but shipped to him as a factor or broker, and the letter amounted in our opinion to an acceptance of the company's offer, and it was so treated by both the appellee and the appellant in their subsequent conduct and correspondence.

Assuming then the existence of a contract under which the steel company shipped to Kirwan as a factor or consignee a carload of steel pieces, which was to be sold by him for it at a price to yield the company $70 per ton less 5% commission to him, the material to be settled for as sold, the remaining question presented by the record is, what is the real meaning of this expression in the appellee's letter of July 7th, to wit: "We to stand all freights and storage charges." This question, involving as it does the construction of a written contract, was unquestionably a matter of law to be passed upon by the court. *Roberts* v. *Bonaparte,* 73 Md. 191. The cardinal rule controlling such an inquiry is stated in the case of *Phoenix Pad Company* v. *Roth,* 127 Md. 543, in which the court, speaking through JUDGE BURKE, said: "It is the duty of the court to ascertain and declare the intention of the parties as expressed in the contract," and in its effort to ascertain that intention the court "is entitled to place itself in the same situation as the parties who made the contract, so as to view the circumstances as they view them, and to judge of the meaning of the words and of the correct application of the language to the things described" (*Nash* v. *Towne,* 5 Wall. (U. S.) 699; *Phoenix Pad Mfg. Co.* v. *Roth, supra*), and to read what the parties said in "the light of surrounding circumstances existing at the time," for "what they meant to

say must be gathered from what they did say viewed from the standpoint they then occupied." *Bond* v. *Humbird,* 118 Md. 658. These principles are only applicable in cases where there is some ambiguity or doubt inherent in the language of the contract in the connection in which it is used, but where the language of the contract is clear, free from ambiguity or doubt and complete, there is no need for construction and it will not be resorted to. 13 *C. J.* 520. They do, however, in our opinion, apply to the facts of the case before us, for while the words employed are, intrinsically and standing separate from the context accompanying them, clear enough, yet when considered in connection with the entire correspondence of which they form a part and the surrounding circumstances they are indefinite, ambiguous and incomplete, and in order to ascertain their real meaning it is essential to view the situation of the parties and the circumstances surrounding the formation of the contract.

The steel company had been recently organized; it had in its possession a quantity of stock in the form of steel pieces or plates which it wanted to sell; after some correspondence on June 29th it offered this stock to Kirwan at $70 per ton; nothing was said about freight; the company had before that, however, offered to sell Kirwan this same carload of steel at $70 per ton "net Buffalo" and it was under those circumstances that Kirwan, in his letter of July 7th referring to this carload of steel, used the expression referred to. At that time he had no immediate prospect of selling the steel. There were few users of the material willing to accept pieces of the size contained in the shipment. His profits from the sale of the carload would in any event be small and he had not up to that time been able to interest any one in the material, but he felt that his customers could be "educated into using" it and that a market could eventually be created for it. These facts were all known to the steel company as well as to Kirwan. The company was apparently not disposing of its stock as rapidly as it desired and it had at that time on hand a carload of the stock which, unless it could be disposed of

through Kirwan, would have to be unloaded. Such was the situation of the parties and such the circumstances accompanying the formation of the contract.

In our opinion there can be no reasonable doubt that when the appellee undertook "to stand all freights and storage charges," he only undertook to obtain for the steel such a price as would enable the appellant to receive $70 per ton for it, subject only to the deduction of 5% for the appellee's commission and without any deduction for freight or storage. Such sum to be payable to it only for such steel as Kirwan sold for it. It did not mean that Kirwan, to secure the opportunity of earning a 5% commission and any profits he might receive on the sale of the carload of steel, which up to that time he had not been able to sell, assumed or rather bound himself to pay all the freights and storage charges which might accrue on it from the time it was shipped by the Buffalo Pressed Steel Company in July, 1916, until it was returned to it in the following October. Kirwan manifestly never intended to incur any such obligation nor to bind himself to pay all the freight and storage charges which might accrue on the car whether he sold any of its contents or not. This conclusion is strengthened by the fact that under the arrangement between the shipper and his consignee, the shipper had the right to recall, as eventually he did recall, the shipment before any part of it had been sold by its consignee, and to terminate its contract with the appellee, and thus deprive him of the opportunity of receiving any profit whatever through a sale of the steel. The appellee could not have understood, when he permitted demurrage to accrue for over two months on a shipment which he held by a tenure so precarious and indefinite, that he, and not the owner of the shipment, was bound to pay such storage charges. Such a construction would be so unreasonable that we cannot assume that the parties to the contract meant any such thing. Certainly we cannot assume that by these words Kirwan, who had refused to buy the steel at $70 a ton net Buffalo, for the opportunity of making a 5% commission and possibly an

additional profit on a carload of material he believed it would be difficult to dispose of at $70 a ton, intended to bind himself for the payment of freight and storage charges which were likely to and in fact did far exceed any possible profit he might receive from the sale of the steel. The steel company had quoted the steel at $70 per ton, net Buffalo. It knew there would be freight charges and it knew that before the steel was all sold by its factor there would likely be storage charges. Its purpose was to receive $70 per ton net for the steel, that is, it did not want any freight or storage charge to be deducted from its selling price. It certainly did not intend, and could not have understood the words quoted above to mean, that Kirwan was to pay freight and storage charges on its property on the mere possibility of earning commissions and a possible profit on its sale. Unless, therefore, the contract did mean that Kirwan was to pay freight and storage charges only on such steel as was sold by him, the expression "we to stand all freights and storage charges" would be meaningless, because there is nothing in the contract or the surrounding circumstances to indicate definitely and certainly to what that expression could refer to or upon what it could operate, for while Kirwan says he "will stand all freights and storage charges," he does not say whether he refers to freight and storage charges on shipment from Buffalo to Worcester and at Worcester, or which might accrue upon the shipment while it was not in his possession or subject to his control, or whether he meant by it to bind himself for the payment of such charges whether he ever received the car or not. These suggestions show how absurd such a construction would be, but absurd as it is, it is nevertheless the only construction under which the appellee could be held responsible for the freight and demurrage charges which accrued on a car while it was not only not in his possession or control, but while it was *en route* contrary to his orders from Worcester to Baltimore and Baltimore to Buffalo.

Without prolonging the consideration of the point, in our opinion the plain and obvious meaning of the contract was

that Kirwan was bound under it to pay all freight and storage charges only on such steel as was actually sold by him, and since he sold no steel and the entire quantity shipped to him was returned to the appellant at its order and request, Kirwan was not liable for the freight and storage charges thereon.

For the reasons stated, we find no error in the ruling of the lower court in granting the defendant's prayer, which is the subject of the only bill of exceptions presented by the record, and the judgment appealed from will therefore be affirmed.

*Judgment affirmed, with costs.*

STOCKBRIDGE, J., dissents.