## J. W. BOTHWELL ET AL., RECEIVERS, *vs.* EMPLOYERS UNDERWRITERS AGENCY, INC.

*Insurance—Agency Contract—Cancellations—Insolvency of Company.*

The appointment of receivers for a mutual insurance company on account of insolvency cancels all outstanding policies of the company.                                    p. 51

Where a contract between a mutual insurance company and an agency company, incorporated for the purpose of writing insurance for the former company, provided that the agency company should receive commissions on "gross premiums, less cancellations," the term "cancellations" referred to cancellations made in the ordinary course of business, and not to cancellations resulting from the insolvency of the insurance company or operation of law, which did not result from the fraud of the agent, the action of the insured, or the undesirability of the risk.                                    pp. 49-57

*Decided February 1st, 1924.*

Appeal from the Circuit Court No. 2 of Baltimore City (DUKE BOND, J.).

Bill by J. W. Bothwell and others, receivers of the Employers Mutual Insurance and Service Company, against the Employers Underwriters Agency, Incorporated. From a decree for defendant, plaintiffs appeal. *Affirmed.*

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Walter L. Clark* and *Clarence K. Bowie,* with whom were *Howard Bryant* and *B. H. Hartogensis* on the brief, for the appellant.

*Vernon Cook,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

In 1915 Edward C. Myers was employed by the National Mutual Safety Insurance Company, a Delaware corporation, operating in Philadelphia, which was engaged in the business of insuring its policy holders against losses which they might sustain as a result of strikes on the part of their employees. In that year the company, because of financial reverses, discontinued its business, and in consequence Myers was thrown out of employment. He had, however, from his work in it, become interested in the subject of strike insurance, and he devoted the next three years of his life to gathering actuarial data, statistics, and information pertaining to that subject and to the investigation and study of labor conditions, and other matters germane to it. As a result of his investigation he became convinced that a company organized to write strike insurance, if properly managed, would be practicable, would serve a useful purpose, and would be a profitable undertaking, and he succeeded in interesting a number of persons in Baltimore in his plans to such an extent that they agreed to "back" him in the organization of such a company, and with their encouragement he at once set about carrying out the plan which he had conceived.

In pursuance of that purpose the Employers Mutual Insurance and Service Company was, on November 18th, 1918, incorporated, to "conduct the business of insurance on the mutual plan without capital stock against losses caused directly or indirectly by strikes or walk-outs of the employees of the persons insured." And on December 4th, 1918, the Employers Underwriters Agency, Incorporated, was incorporated, as stated by the appellants, "to act as a general agency of insurance companies, to solicit business for insurance companies, to enter into agency agreements with insurance companies, to conduct the business and affairs of such companies, and to act as agents thereof in all respects, and for other purposes." The capital stock of the agency company "consisted of 1,000 shares of preferred stock of the

par value of $50.00 each and 1,000 shares of common stock without any nominal par value." The charter provided that the preferred stock should be entitled to eight per cent. cumulative diviends' and should be redeemable on any dividend date upon one months' notice, and should be non-voting unless two semi-annual dividends were not paid, in which event the sole voting power, lodged under the charter in the common stock, should shift to the holders of the preferred stock; that on the 6th day of January, 1919, 1,000 shares of said common stock and 600 shares of said preferred stock were issued for certain properties, including actuarial figures, data, forms, etc., then in the possession of a certain Edward C. Myers; that subsequently additional preferred stock was issued, and by an amendment to the charter which became effective on the 6th day of April, 1920, upon the vote of 616 shares of preferred stock, the voting power having in the meantime passed to the preferred stock, the authorized capital stock of the company was fixed at 2,000 shares of preferred stock of the par value of $50.00 per share, and 2,000 shares of common stock at no par value, at which time there were then outstanding 869 shares of the preferred stock of the par value of $50.00 per share and 1,000 shares of common stock; and on said 6th day of April, 1920, there was recorded with the State Tax Commission a record showing that by resolution of a board of directors passed on the 11th day of March, 1920, it was declared advisable to issue 500 shares of common and 1,000 shares of preferred stock to be sold for cash at not less than $50.00 for two shares of preferred and one share of common stock; and subsequently at a meeting of the preferred stockholders of the company held on the 24th day of March, 1920, the issuance of stock as advised by the board of directors was duly authorized; that as a matter of fact the total amount of money paid by the stockholders to the company for stock issued to them was $38,025.00." After the incorporation and organization of the two companies, they entered into a

sealed agreement on December 18th, 1918, which contained these clauses:

> "The Agency Company hereby agrees to secure business for the Insurance Company, that is to say, to sell policies of insurance for said company or to secure members for said company, and to act as its general agent in selling such policies and securing such members, and to do any and all such acts and things as may be reasonably proper for the purpose of securing such business and the issuance of such policies and the selling of such insurance and the securing of such members for the Insurance Company, and the Agency Company will also assume full charge of all underwriting for the Insurance Company and shall pay all expenses of every kind incurred in or incidental to the carrying out of the above purposes, it being understood, however, that the Insurance Company is to pay all federal, state or municipal taxes or licenses for which it is or may become liable, and all expenses incurred in connection with the losses of said company.

> "All details as to the best method of procedure for the purposes hereinbefore mentioned are left to the judgment and discretion of the said Agency Company and its duly authorized officers.

> "The Agency Company shall be the sole and exclusive agent of the Insurance Company for the purposes hereinbefore mentioned, and this contract shall continue for the period of nine (9) years from the first issuance of policies.

> "The Agency Company shall receive as compensation hereunder 30 per cent. of all gross premiums paid to or secured for the Insurance Company during the continuce of this agreement. Said percentage, however, is not to be paid on any assessments which the Insurance Company may make against its members."

On December 1st, 1919, that agreement was modified by a supplemental agreement made by the same parties, which among others contained these provisions:

"The Agency Company shall receive the following compensation for its services: (a) During the first year of the operation of the Insurance Company, that is to say, during the period of one year from the day on which the first policies issued by said company take effect, the Agency Company shall receive as compensation thirty per cent. (30%) of all gross premiums (less cancellations) paid to or secured for the Insurance Company for premiums covering insurance for said first year; (b) for the remaining term of the contract after the first year above specified, the Agency Company shall receive each year as compensation, in lieu of the thirty per cent. (30%) provided for the first year, the following percentage on each year's business: fourteen and three-tenths per cent. (14.3%) on the gross premiums, less cancellations, up to and including the first five million dollars ($5,000,000) of such gross premiums. * * *

"(a) The Agency Company agrees to conduct research work for the purpose of collecting data with a view to fixing proper rates for the business of the Insurance Company and for the purpose of obtaining information as to the relative risks involved in issuing policies to persons or corporations engaged in various lines of business; (b) the Agency Company also agrees in the event of a strike occurring at the plant of any assured, when requested so to do, to furnish a suitable person or persons to act as mediator or mediators in an endeavor to adjust differences between the members and its employees, and to terminate the strike.

"It is understood and agreed that in consideration of the changes herein made the obligation heretofore imposed on the Agency Company by the original contract to pay all expenses of every kind of the Insurance Company except federal, state and municipal taxes and licenses and the expenses incurred in connection with the losses of said company, shall apply only to the first year as defined in paragraph 3, and that in subsequent years the Agency Company shall be relieved from the obligation of paying expenses of the Insur-

ance Company, except that in such subsequent years the Agency Company shall continue to pay all expenses incurred in connection with obtaining business or members and expenses incidental to the underwriting and research work hereinbefore mentioned and the expenses of furnishing mediators hereinbefore mentioned.

"It is also understood and agreed that the Insurance Company shall at all times have full control of its own business and affairs, except as herein expressly limited and provided."

On January 2nd, 1920, the agency company entered into an agreement with Myers which in part contained the following recitals and undertakings:

"Whereas the said agency is the sole agent for Employers Mutual Insurance and Service Company, a Maryland corporation, organized to issue policies of insurance to indemnify employers against loss through strikes, and as such agent the said agency has undertaken to sell strike insurance; and

"Whereas the said Meyers has evolved a system to be used, and the said agency desires to secure his services to sell such insurance, and the said Meyers is willing to devote all his time and energy and use his knowledge of the business of strike insurance for the benefit of the said agency and for the consideration hereinafter set forth.

"Now, therefore, this agreement witnesseth that in consideration of the premises and the mutual promises and undertakings of the parties hereto and the sum of one dollar each to the other paid, the receipt whereof is hereby acknowledged, the parties hereto covenant and agree as follows:

"1.   The said agency hereby appoints the said Meyers as its sole agent for the sale of strike insurance for the world for a period of ten years, accounting from the first day of January, in the year nineteen hundred and twenty.

"2.   During the first year of the operation of the Employers Mutual Insurance and Service Company,

accounting from the day on which the first policies issued by the said company take effect, the said agency agrees to allow the said Meyers a commission of fifteen per centum on all premiums and renewals paid to it or to the said Employers Mutual Insurance and Service Company, or to any other company or companies which may be organized hereafter for which it may be agent for strike insurance, and settlement shall be made on or before the 10th day of each month for the preceding month. For and during each remaining year of the contract after the first year above specified, the commission of the said Meyers shall be as follows: twelve and five-tenths per cent. (12.5%) on the gross premiums, less cancellations, up to and including the first five million dollars ($5,000,000) of such gross premiums, less cancellations. * * *

"And the said agency further agrees not to appoint any other agents or agent, general or special, for solicitors, or engage any broker to sell strike insurance during the continuance in force of this agreement, or any extension or renewal thereof, but agrees that the said Meyers shall have full and exclusive right and power to engage and discharge all employees, agents, solicitors and brokers and to fix their compensation.

"And the said agency further agrees to provide suitable offices, furniture, stationery, postage, telephone, advertising of every description and to pay the salaries and wages of an adequate office force (not engaged in selling insurance) and incidental office expenses."

At the time these several agreements were made, Mr. Myers was on the directorate of both companies, and appears to have been president of the insurance company, and, as a result of the agreement last referred to, he became the general agent of the agency company.

With the appointment of Myers as general agent, the plan which he had conceived was complete, and the companies began to function. That plan in brief was this: the insurance company was to issue the policies of insurance and the

agency company was to sell them through Myers as its sales-man, all expenses incurred in operating the insurance com-pany as well as the agency company and Myers' commis-sions and expenses to be paid out of the agency company's commissions.    The plan operated for a while apparently with success.    A number of policies were sold, its business steadily expanded, and a number of prominent and suc-cessful manufacturers became interested in it, and some of them accepted positions on the directorate of the insurance company.    The dividends on its preferred stock were regu-arly paid up to the end of 1921, and seventy-five per cent. of that stock was redeemed at par.

In the beginning of 1921, however, certain warning indi-cations had appeared that presaged the possibility of an interruption of its success.    In the course of its business the insurance company had written a large number of poli-cies for printers and publishers in various parts of the country, covering losses incident to an interruption of their business as a result of strikes or walk-outs.    At that time the "closed shop" printers were operating under an agreement with their employees, covering the terms of their employ-ment, which expired on or about May 1st, 1921, and those conversant with the situation apprehended that with the expiration of that agreement differences would arise be-tween the employers and employees engaged in that business as to the hours of employment, compensation, etc., which might result in a general strike.    Notwithstanding these warnings, the agency company continued to solicit and accept applications for strike insurance from persons engaged in the printing business up until May, 1921, and the insurance company issued strike insurance policies to such persons on the applications brought to it by the agency company.    The only thing which was done to lessen the risk which it assumed in issuing these policies was to increase its rates, and to except from the protection of the policies losses occurring during a certain number of days at the beginning of any strike, covered by them.

The anticipated strike did occur, and in consequence of the number and amount of claims against the insurance company arising from it, and also from claims growing out of a strike of the textile workers in companies insured by the company, in the early part of 1921 it became apparent that the insurance company was getting into financial difficulties, and its financial condition became progressively worse as other claims came in, until it ceased to do business on August 26th, 1921. In September, 1921, certain of its policy holders, who were also members of the insurance company, asked that the directors then holding office resign, which they accordingly did and other directors were elected in their places. Prior to that, on August 26th, 1921, the condition of the company having been brought to the attention of the State Insurance Commissioner, he filed a bill of complaint against it in Circuit Court No. 2 of Baltimore City, in which he asked that it be restrained from continuing its business, and that a commission be appointed to examine into its affairs. Upon that bill an order was passed and a commission appointed as prayed, but no receiver was appointed at that time. From the time of the organization of the two companies, the insurance company and the agency company, while the personnel of the directorates was not identical, yet several men interested in both companies held positions on both boards, and the active directors of the agency company appear also to have conducted the affairs of the insurance company. Upon the resignation of the "old" directors, "new" directors were elected and continued, with the consent of the court, to carry on the business of the insurance company, except that they did not undertake to issue new policies. The change in the personnel of the insurance company's directorate was made in connection with a plan formed by certain of its policy holders to reorganize it and carry its business on and, on September 30th, 1921, a form of agreement was drafted and signed by certain "trustees," which in part contained these provisions:

"This agreement made this 30th day of September, 1921, by and between the Employers Mutual Insurance and Service Company * * * and such of the policy holders of said party of the first part as shall become parties hereto in the manner hereinafter provided * * * parties of the second part, and James W. Bothwell, William E. Thomsen, W. J. Michel and C. Stanley Hurlbutt, together with an appointee of the Insurance Commissioner of Maryland (when he shall execute this agreement), trustees, hereinafter appointed for the purpose of carrying out this agreement, hereinafter called trustees, party of the third part.

"At the instance of the Insurance Commissioner of Maryland, an application for the appointment of a receiver of the old company is now pending in the Circuit Court No. 2 of Baltimore City on the theory that the said company is insolvent. * * * and it is the purpose of this agreement to effect a reorganization of said old company, the organization as hereinafter provided of a new company with similar objects, and to provide an equitable, quick and economical method for the determination of the amount due on the respective claims of all of said policy holders, and of converting its assets into cash, including unpaid assessments due by certain policy holders to the said old company * * * .

"The policy holders hereby make, constitute and appoint James W. Bothwell, Wm. E. Thomsen, W. J. Michel and C. Stanley Hurlbutt, and their successors, to be selected as hereinafter provided, the parties of the first part hereto, as trustees, with all the rights, privileges and powers given to and vested in said trustees by this agreement. * * *

"Whenever in the judgment of the said trustees (and their judgment shall be final) there shall have been assigned to them seventy-five per cent. in amount of the claims filed with the old company against it, the old company shall pay over to the said trustees the sum of three hundred thousand dollars in cash, which shall be credited as a payment on account of the dis-

tributive shares of the assets of said old company, to which any, some or all the claims assigned to said trustees shall finally be determined to be entitled, but shall be held, nevertheless, for the common benefit of all policy holders. * * *

"Contemporaneously with the receipt by the trustees of said sum of three hundred thousand dollars, they shall incorporate or cause to be incorporated a stock company, or a stock and mutual company, for the purpose of conducting the business of insurance against losses caused directly or indirectly by strikes or walkouts of the employees of the persons insured, with a capital stock of one-hundred thousand dollars and a paid-in surplus of one hundred and fifty thousand dollars."

That agreement, although signed by the "trustees," does not appear to have been executed by either of the other parties to it, but, on October 14th, 1921, the directors of the "old" company posted at the Baltimore post office the following letter or notice to all of its policy holders:

"Please take notice that in accordance with the terms and conditions of Policy No. .... issued by the Employers Mutual Insurance and Service Company to you, the company hereby serves notice of cancellation effective fifteen (15) days from date hereof.

"This notice has been posted at the United States Postoffice in Baltimore, Maryland, prior to noon, October 14th, 1921, Eastern Standard Time; therefore on and after noon, October 29th, Eastern Standard hime, your policy will cease and determine.

"Employers Mutual Insurance and Service Company.
"By order of the President.
                         "Wm. Edward Thomsen,
                                        "Secretary."

That cancellation was given under the following clause of the policies issued by the company:

"F.  This policy may be cancelled at any time after the first policy year at the request of the assured, or, without prejudice to the rights of the assured as re-

spects anything that may occur during the period this policy is in force, by the company, during any year, by giving fifteen (15) days written notice of such cancellation; the effective date of such cancellation, to wit, the last of said fifteen (15) days, shall then be the end of the policy period. If this policy shall be cancelled as herein provided, or become void, or cease, the earned premiums shall be computed and adjusted at short rate in accordance with the table printed hereon; except that if this policy is cancelled by the company, or by the assured when actually retiring from the business herein described, the earned premium shall be adjusted pro rata; but in no event shall the earned premium be less than . . . . . . . . . . . ($. . . . . . . .) dollars."

On November 9th, 1921, receivers were appointed in the suit instituted by the Insurance Commissioner, and they demanded of the appellee a return of the commissions which it had received from the insurance company on the unearned portions of the premiums paid on the cancelled policies. The commissions thus demanded were computed in the following table, sworn to in the trial of the case by an accountant employed to audit the claims against the insurance company:

|  | Amount. | Rate of Commission. | Commission. |
|---|---|---|---|
| "Unearned on premiums written prior to May 20, 1921 . . . . . . . . . | $156,815.65 | .30 | $42,400.28 |
| "Unearned on premiums written after May 19, 1921 . . . . . . . . . . . . | 28,229.95 | .143 | 3,824.23 |
|  | $185,045.60 |  | $46,224.51 |
| "Earned premiums collected but on which no commission has been paid . . . . . . . . | 1,494.44 | .143 | 229.27 |
|  |  |  | $45,995.24." |

The appellee refused to return the commissions which it had received on the unearned portions of the cancelled policies, whereupon the appellants filed the bill of complaint in this case. An amendment was made to that bill, and the amended bill, after setting out in some detail the facts to which we have referred, and after charging that the agency company had paid to its preferred stockholders in retirement of their stock $57,037.50, sets out the theory upon which it rests in the following language:

"That the moneys so paid out of its capital to its preferred stockholders by the Agency Company was paid during the period when the affairs of the Insurance Company were becoming more and more involved in financial difficulty and loss, and during the period when cancellations of the outstanding policies by the Insurance Company were imminent in order to protect itself from loss, and that all of these facts were well known to the directors and stockholders of the Agency Company, and that said payments were made in spite of but with full knowledge of the fact that the commissions paid to and retained by the Agency Company were not in truth and in fact earned until the policies had expired and the possibility of cancellations had ceased; and that the action so taken in the retirement of the preferred stock was done with full knowledge of all the facts on the part of the directors and stockholders and with the deliberate intent to deplete and pay out the capital of the company to its stockholders so that the Agency Company would become unable to pay to the Insurance Company the commissions on unearned premiums of policies cancelled by the Insurance Company; that your orators have been informed by the counsel of the Agency Company and therefore charge that there is now in the possession of the Agency Company only $10,000, and that it has no other resources and assets which would enable it to pay the claim of the Insurance Company hereinbefore stated, but that in fact the Agency Company is unable to make said payment, and your orators therefore charge that the said Agency

Company is insolvent, and that a receiver should be appointed to take charge of its assets and wind up its affairs.

"That in view of the payments so made as aforesaid by the Agency Company in the retirement of its preferred stock and of the denial by the Agency Company of any liability to return to the Insurance Company the commissions on unearned premiums, your orators believe and therefore charge that it is the intention of the Agency Company to make additional payments to the preferred stockholders in retirement of preferred stock, and therefore the remaining assets of the Agency Company will also be distributed unless the said company is restrained by an order of this court."

Upon that bill the appellants asked that a receiver be appointed for the agency company; that it be compelled to discover the amounts paid by it to its stockholders in dividends and in retirement of their stock; that it be restrained from disposing of its assets, and that it be dissolved and its effects applied to the satisfaction of its liabilities.

The defendant answered the bill and, in its answer, after denying certain allegations of fact in it, it denied that it was insolvent, and further denied that the plaintiffs were entitled to a return of any part of the commissions on premiums paid it. After that answer had been filed the plaintiffs amended the bill, and to the amended bill the defendant demurred, whereupon the plaintiffs again amended it, and to the second amended bill the defendant answered. Testimony in connection with the issues made by these pleadings was taken in open court and at its conclusion the court signed a decree dismissing the bill, and it is from that decree that this appeal was taken.

The controlling question presented by the appeal is simple, and may be stated in this form: Does the term "cancellation" in the expression "gross premiums (less cancellations)," as used in that clause of the contract which fixes the agent's commission, include cancellations resulting from

the operation of law, the insolvency of the insurer, or from its voluntary act in winding up its affairs, or does it only apply to such cancellations as are made in the ordinary course of business?

Much of the testimony found in the record throws little light on that issue, but was adduced for the apparent purpose of reflecting upon the good faith of the agency company in its relations with the insurance company, and there are circumstances shown by it which could warrant the inference that, in securing business for the insurance company, it was more concerned in the profits which it would secure from its commissions on that business than in the welfare and security of the members of the insurance company. But while such an inference may be drawn from the fact that, at a time when it must have been apparent to the agency company that the insurance company was in serious financial difficulty, it continued to accept applications for a class of risks which could not well have had any other effect than to add to the embarrassment of the company, it cannot be drawn from the nature of the organization of the two companies, or from the contracts which measured and defined their mutual obligations. Mr. Myers and his associates obviously and naturally organized the two companies not merely to aid employers in dealing with striking employees, but because they expected to profit from the organization, nor was there anything sinister or dishonorable in such a purpose. They risked capital, and they had expended time and labor on their faith in an idea. If it failed they lost, if it succeeded they profited. The only way, however, in which they could profit was through the sale of insurance, since they could not, in the very nature of the thing, participate in any of the profits of the insurance company, because that company was in effect an association of employers whose premiums formed a fund for their mutual protection, and as the promoters were not employers they could not participate in those benefits. The companies were organized, and the contracts were drawn and executed, for

the clear and obvious purpose of securing to those, whose skill, labor, and resources had produced and carried out the plan, reasonable compensation for their expenditure of time, energy, and money. But assuming that that was the purpose of the promoters and the agency company, and even assuming that the agency company allowed its greed for commissions to lead it to accept business which involved risks on the part of the insurance company which sound business judgment should have induced it to refuse, those facts have nothing to do with the matter before us, which is the construction of a contract, **the meaning of which** must be determined by its language as that language was understood by the parties at the time it was made.

And after a very careful examination of the contracts to which we have referred and the evidence relating to the manner in which the agency company discharged the obligations imposed upon it by them, we have been unable to discover anything which can have the effect of giving to those contracts any other meaning than that conveyed by the usual and ordinary interpretation of the language employed in them, taken in connection with the circumstances under which they were made, and the thing they intended to accomplish.

Returning to the question stated above, the contention of the appellants postulates an assumption of fact, that the policies were cancelled, either by operation of law or by the act of the insurance company, and an assumption of law, that when they were cancelled the insurance company became at once entitled to receive from the agency company a return of the commissions paid it on the unearned portions of the premiums paid on the cancelled policies.

In regard to the first question it is sufficient to say that all outstanding policies of the company were cancelled upon the appointment of receivers for it on November 9th, 1921, so that for the purpose of the question before us it is immaterial whether or not the attempted cancellation by the company on October 14th, 1921, was effective.

As already stated, the second question turns upon the meaning to be given the words "gross premiums (less cancellations)."

We have been referred to four cases in which the term "cancellation" was construed and interpreted in connection with facts sufficiently analogous to those involved in the instant case to render the conclusions reached in them of assistance in determining its meaning in the contract under consideration. Those cases are *Johnson* v. *Button,* 120 Va. 339; *Hays* v. *Union Fire Ins. Co.,* 167 N. C. 82; *Garfield* v. *Rutland Ins. Co.,* 69 Vt. 549, and *Milwaukee Mechanics Ins. Co.* v. *Warren,* 150 Cal. 346.

But before considering those cases we will revert for a moment to the situation of the parties at the time the contract was made, and to the purpose they intended to accomplish by it. It is not disputed that both companies were organized, and the contract between them executed, as integral parts of a single plan, the purpose of which was to issue and sell strike insurance, in such a manner that the persons promoting the plan should secure a profit from its successful operation. And it is also established that when the contract was executed the promoters controlled both the insurance company and the agency company, and that their primary purpose was to secure to the agency company a certain part of any profit which might accrue from the operation of the insurance company, and which was the sole inducement which led the promoters to organize the companies.

It is also apparent that the parties to the contract knew and understood at the time, that before the agency company could realize any profits from the sale of strike insurance issued by the insurance company, it would be necessary to expend considerable sums of money for the employment of agents, clerks, attorneys, and other assistants, and for the rent of offices, and for such other expenses as would likely be incurred in selling that comparatively new form of insurance.

If these facts are true, and upon the record before us

they cannot be questioned, it may be assumed that the agency company at least did not intend to put into the hands of the insurance company the power to destroy it and deprive it of the profits it had earned at any time that the exigencies of its business might suggest such a step, by cancelling its policies, and winding up its business, and demanding of the agency company the return of the commissions paid it on the unearned portions of the cancelled premiums. And while an undisclosed intention cannot affect the meaning of the words employed in a contract, where those words are clear and unambiguous, yet it may be of assistance in interpreting the relation of such words to the subject matter of the contract where there is an obvious conflict between the literal meaning of the words employed and the apparent intention of the parties. *Phœnix Pad Company* v. *Roth,* 127 Md. 543; *Bond* v. *Humbird,* 118 Md. 658; *Buffalo Steel Co.* v. *Kirwan,* 138 Md. 65; *Kleiman* v. *Orion Knitting Mills,* 139 Md. 554.

Coming back to the cases referred to, the first cited is that of *Johnson* v. *Button,* 120 Va. 339, the facts of which were as follows: The American Union Fire Insurance Company, a Pennsylvania corporation, was engaged in business in Virginia and Pennsylvania. It appointed Sol Miller its general agent in Virginia. Subsequently it became insolvent, and receivers were appointed for it in a proceeding instituted in the Court of Common Pleas of Dauphin County, Pennsylvania, by the Insurance Commissioner of that state, and a decree passed in that case also provided that the company be dissolved and its affairs liquidated. Following that, ancillary proceedings in Virginia were instituted by the insurance commissioner of that state for the purpose of having its assets turned over to him, that he might distribute them among those entitled thereto. In the course of that proceeding the proposition was asserted that Miller was obliged to return the commissions which he had received on the unearned portions of premiums which had been can-

celled by the receivership. In discussing that question the court said:

"The contention of appellant with respect to the agents' compensation is that, inasmuch as their commissions were based upon 'net premiums,' all claims for 'return premiums' should be charged with their proportionate part of the commissions; and furthermore, that as the policies had not been cancelled by the company, return premiums should be computed upon what is known as the 'short rate' basis. The opposing theory of the agents conformed to the finding of the commissioner as approved by the circuit court.

"The affidavits of representative agents of a number of fire insurance companies show that it is the custom and usage with such companies to construe the term 'net premiums' in contracts similar to the one in question to mean that the general or local agent of the company should return the proper proportion of all premiums which had either been cancelled by the insured, or by the company while a going concern, without any neglect or default on the part of such company; but that where the company had been placed in the hands of a receiver, and its policies cancelled without fault on the part of the agent, no obligation rested on such agent to return any part of the commissions received by him on premiums on policies so cancelled. * * *

"These authorities hold that insolvency of the company *ipso facto* cancels its outstanding policies and entitles policy holders to 'return premiums' upon the *'pro rata'* instead of upon the 'short rate' basis, as contended by the appellant.

"The case of *Hay v. Union Fire Ins. Co. and the Monongahela Underwriters' Agency,* etc., 167 N. C. 82, 83 S. E. 242, involved the same question with the same companies touching the effect of their insolvency upon the North Carolina business, and therefore is directly in point. The facts in the two cases are identical, and, upon a review of the authorities, the court holds:

" 'When a fire company, after writing numerous policies, became insolvent, it could not demand a return of a pro-

portionate part of the commissions paid the agents, there being no custom requiring such return of commissions as in case of surrender, and the company not being entitled to profit by its own default; hence no such deduction could be made from claims of policy holders for unearned premiums assigned to the agents.'

"The agent's claim to commissions rests upon the conclusive ground that he has fully complied with the terms of his employment, and the transaction fails of accomplishment from no fault of his, but from the insolvency of the company. See the well reasoned case of *Currier* v. *Mut. Reserve Fund Life Assn.,* 108 Fed. 737, 47 C. C. A. (5th Cir.) 651, citing 4 Am. & Eng. Enc. Law (2nd Ed.) 972; *Story on Agency,* sec. 329; *Mechem on Agency,* secs. 611, 612; 16 *Am. & Eng. Enc. Law* (2nd Ed.) 911; *Knock* v. *Emmerling,* 22 How. 69, 16 L. Ed. 292."

In the case of *Hay* v. *Union Fire Ins. Co.,* 167 N. C. 82, the facts were substantially similar to those to which we have just referred. There the state insurance commissioner contended "that, where a local agent, in order to accommodate his policy holders and to save them the expense and trouble of filing their small claims, saw fit to advance the amounts due them, having the claim assigned to such local agent, that the local agents are not entitled to prove for such amount, but should deduct therefrom one-half of the commission which the agent earned and received when he placed the business originally." In referring to that contention the court said:

"If the company fails, as this one did, as between the company and the policy holder, the latter is entitled to recover the full amount of the unearned premium. But, as between the local agent and the company, the former has done his work by securing and writing the policy, and the subsequent default of the company cannot entitle it to recover back from the agent any part of his commission. That would entitle the company to profit by its own wrong or de-

fault. This principle is so clear that no citation is necessary. * * *

"Besides, there was evidence in this case by T. T. Hay, the general agent of the company: 'We had no agreement whatever with regard to the agents as to the effect upon their commissions if the company should become insolvent.' In the absence of an express agreement that the agents were to refund a *pro rata* part of their earnings in such event, it was incumbent upon the defendant to show an implied contract that there was such a usage in such case. On the contrary, the agent showed, and the referee found, that the usage was that the commissions in such cases upon the unearned premium should not be returned by the local agents, in the absence of express agreement."

In the case of *Garfield* v. *Rutland Ins. Co.*, 69 Vt. 549, in discussing a similar question, the court said: "A question is raised as to what the trustees are entitled to retain on account of their services. They were to have twenty per cent. of the moneys received by them on account of premiums actually paid. We think this refers to the money received in regular course, and not to a balance determined by future cancellations. This view seems to be supported by the use of the same phrase in the cancellation clause of the policy, which refers to the contingency of cancellation, 'the premium having been actually paid.' "

The case of *Milwaukee Mechanics' Ins. Co.* v. *Warren*, 150 Cal. 346, involved the claim of an insurance company against its agent for the return of policies apparently cancelled in the ordinary course of business, and the court in dealing with that claim said: "It appears from the record that in a number of instances, where policies had been written by Warren and Lanktree, return premiums were paid by the company after the termination of Warren and Lanktree's agency. In making up his statement of account, the referee charged to Warren and Lanktree thirty-five per cent. of these return premiums, and there was a good deal of discussion in the lower court as to the propriety of this charge.

Under the contract, it is clear that Warren and Lanktree were chargeable with these payments. The agreement under which they were appointed general agents provided that as compensation for their services they were to receive thirty-five per cent. of the gross premiums received by the company in their territory 'after deducting all return premiums, rebates, and reinsurance.' "

The case of *American Steam Boiler Company* v. *Anderson,* 6 N. Y. Supp. 507, cited in the decision last referred to, involved a claim for the return of the commission paid an agent on the unearned portion of a premium which was cancelled in the ordinary course of business through the agent's solicitation. And *National Union Fire Ins. Co.* v. *Nason,* 21 Cal. App. 297, 131 Pac. 755, was a case in which the insurance company claimed the return of commissions on return premiums on policies cancelled apparently in the ordinary course of business. No one of the three cases last referred to involved the cancellation of policies by operation of law through the appointment of a receiver, nor the cancellation of all of its outstanding policies by an insolvent insurance company, and they are hardly in point here. That the insurance company would be entitled to a return of commissions paid to its agent on the unearned portion of a premium cancelled in the ordinary course of business either at the instance of the insurer or the insured, where the agency contract provides that commissions shall be paid on gross premiums less rebates, return premiums and reinsurances cannot well be questioned, but that is not the question raised by this appeal. And it is clear that the term "cancellations" in the clause under consideration referred to such cancellations as were involved in those cases, that is cancellations made in the ordinary course of business, and not to cancellations resulting from the insolvency of the company or operation of law, which did not result from the fraud of the agent, the action of the insured, or the undesirability of the risk. And that conclusion is supported, we think, by the decision in the case of *Johnson* v. *Bulton, supra,* because the

expression "net premiums" involved in that case could have meant nothing different from "gross premiums (less cancellations)," used in this case, because the only possible difference between "net" and "gross" premiums would be that resulting from cancellations, since there could be no other deductions from the gross premiums than such as resulted from their cancellation during the term for which they were issued. And we cannot suppose, when we consider the situation of the parties at the time the agency contract was made, and the purpose they were intended to accomplish, that they meant the term "cancellations" in the expression "gross premiums (less cancellations)" to embrace any cancellations except such as were made in the ordinary course of the insurance business.

For this reason we have reached the conclusion that the receivers are not entitled to receive from the appellee commissions paid it on the unearned portions of premiums cancelled through the operation of law or as a result of the insurance company's insolvency. And it follows from that conclusion that the decree appealed from must be affirmed.

*Decree affirmed, with costs to the appellee.*