# CIRCUIT COURT OF BALTIMORE CITY.

Filed November 1, 1924.

ELIZABETH RAITH, ET AL.,
VS.
MARY FEAR LECKNER, ET AL.

*Vernon Cook, E. T. Dickerson, William H. Lawrence* and *Adolph Gutberlet* for parties other than Mary Fear Leckner.

*Edward L. Ward* for Mary Fear Leckner.

STEIN, J.—

The objects of these proceedings are:

A. To have this Court decree that a deed by the late Boston Fear of his home place to his daughter Mary, while absolute in form was intended to con-

vey and did convey that property to her "in trust for the benefit of himself and his family" then consisting of his nine children and his three infant grandsons, children of a deceased son.

B. That a mortgage to Edward L. Ward on that property from the daughter, Mary Leckner, binds only Mrs. Leckner's one-tenth interest therein.

C. And for general relief.

While the three grandchildren and some of his children are defendants, yet the suit is directed solely against Mrs. Leckner and her husband and Mr. Ward, their mortgagee.

The record shows that while living on the property in the deed attacked, Boston Fear bought it for $20,000; which he paid as follows, viz.: $2,500 out of his moneys; $12,000 obtained through a loan secured by a first mortgage on the property; then secured the remaining $5,500 by a second mortgage; which two mortgages are long overdue; thereafter by deed dated November 15th, 1907, recorded February 18th, 1908, for a consideration named in the deed as "five dollars and other good and valuable considerations," Boston Fear conveyed the property to Mary Fear, his eldest child, who some years thereafter married and is now the wife of the defendant, John B. Leckner.

The parties to this suit other than Mrs. Leckner and her husband and Mr. Ward, their mortgagee, claim that the consideration of "five dollars" in the deed was not paid, or intended to have been paid, and that this deed from Boston Fear to his daughter Mary was made upon the trust that she should hold the property for her father and his family, then consisting of himself, his nine children and the above named three grandchildren.

This Mrs. Leckner denies and claims the deed to her was absolute; that the considerations therefor were the cancellation of debts her father owed her for money loaned him, and his desire to provide for her because of a slight impediment in hearing and speech.

Boston Fear, for many years was a builder in this city, and in the language of his son-in-law, Mr. Thomas, "was a man who was always credited with the best kind of what we might call 'horse sense,' was a very smart man and it was unfortunate that he never received any education, could

write only his own name and could not read at all."

His wife died in 1900, leaving a family of ten children, some very young. Mary, the grantee in the deed, who was the eldest, after her mother's death stayed at home and raised the young children.

After the deed to Mary Fear and until his death on April 8th, 1918, more than ten years, Boston Fear lived in the home place with all his living children and grandchildren, save Mrs. Thomas, a daughter, who had married in 1904; some of the sons were living there at the date of the hearing; two of the daughters did not leave until their marriage, which took place after their father's death. Mrs. Anderson, a daughter, who was married in 1906, left about eleven months thereafter; another daughter, Mrs. Raith, married December 17th, 1917, and left; the three infant grandchildren lived there until 1912, when their mother took them with her to her mother's house. All left voluntarily. So that the property conveyed by the deed always was the home of Boston Fear and his family, composed of his children and three grandchildren.

Boston Fear, with the assent and acquiescence of Mary Fear, always dealt with the property as if his own; although Mary Fear was a grown woman, and during the last few months of her father's life, the wife of Mr. Leckner; Mr. Fear did not consult her about what he did in or about the property; nor did she ever object to or advise with him about either the property or his actions about it. On May 19, 1917, at her father's direction, and over her husband's protest, she, then Mrs. Leckner, conveyed all of her property to Harwell W. Thomas as trustee for the benefit of creditors, under which deed the property passed to the trustee.

Although her father, her sisters, her brothers and three fatherless nephews, lived on the home place as part of her father's family, Mrs. Fear never objected; never asked for board; testifying about this as follows:

"Q. Your sisters and brothers, they also said that you did not charge them any board when they lived there. Tell us why that was?

A. That was their home, Mr. Ward.

Q. What happened to them when they got married, did they leave or stay

there when you had a sister or brother got married?

A. The ones that got married, some of them stayed *home*, and some of them went for themselves.

Q. You did not charge any of them board or rent?

A. No, sir."

The testimony in support of the plaintiffs' theory that Mary Fear held the property in trust consists of statements of Boston Fear made before and after the execution of the deed; either to Mary Fear or in her presence, and testimony showing the conduct of the parties to the deed after its execution. The most persuasive testimony is the following from that of Mr. Harwell H. Thomas, who drew the deed, i. e., "that a few days before the deed was drawn in a discussion at which there were present the witness, Mr. Fear, his daughters, Rosalie (Mrs. Welsh), Daisy (Mrs. Anderson), and Mary Fear, Mr. Fear said in the presence of all that "he wanted her to have this deed made out conveying the property from himself to Mary to be held by her for the entire family, knowing that the equity would be very great at some future time, and he wanted to be sure that it would be conserved for the benefit of all of his children."

Other oral testimony includes many statements of Mr. Fear, after the date of the deed, some made to his daughter Mary, others made in her presence and hearing "that she was guardian for the children;" to all of which she did not reply, save in one instance when she said "she would turn it (meaning the property) back and let him (the father) bother with it."

Mrs. Leckner denies that any of these statements were made; insists that the deed to her was absolute and for the "good and valuable considerations" above set out, viz.: the cancellation of debts her father owed her for money loaned, and his desire to protect her because she was hard of hearing and had a slight impediment of speech.

She testified she carried on in the City of Baltimore the business of a speculative builder; from the proceeds of which she paid the taxes, the mortgage interest and the expense of keeping the property in order. She admitted she had no practical knowledge or experience in building; that in carrying on the building business she did what her father told her to do; that he attended to everything in connection with business; save the signing of papers, which she signed when and as directed by her father, always without question.

She testified the moneys she lent her father before the date of the deed were lent as follows, viz.:

Sale in 1891 of Farnandis property on North avenue for ..... $3,500
Sale in 1902 of Charles County property for ................ 1,700

$5,200

so that if these loans were made, and were not barried by limitations, on November 15th, 1906, the date of the deed, at least they were "stale claims."

Her testimony is that in a desire to protect his favored daughter, Boston Fear conveyed to her a farm of 16 or 17 acres, subject to two large mortgages; transferred to satisfy loans, made long before, amounting without interest to $5,200; more than twice his equity of $2,500; the property conveyed not revenue producing, subject to yearly interest charges of $1,050, as well as taxes, insurance and repairs; the favored daughter an inexperienced woman, without money, unable to earn any and without any means of stocking or farming the place.

In her examination in chief Mary Fear spoke of other sums of money she lent to her father; their nature is shown by the following from her cross-examination, viz.:

"Q. Outside of the home place did your father ever give you any land?

A. He gave me land, but he got it back.

Q. Did he ever give you anything that he did not get back?

A. I do not know of anything I ever got from him that I did not give back.

Q. Why did you give it back to him?

A. *Because it belonged to him.*"

So that the transactions testified to by Mrs. Leckner, as well as the moneys she testified as having received and lent her father were her father's transactions and moneys; she figuring in the transactions, not alone because her father could not read and could write only his name; but because in his

building operation he found it convenient, and at times necessary for some one to hold property for him as a basis of credit or convenience, and found such a person in Mary, his unmarried adult daughter.

The oral testimony offered to show the circumstances under which the deed was made to Mary Fear, and her so-called admissions before and after its execution, were admitted subject to exception, and exceptions thereto were filed.

The statements made before the date of the deed includes the grantor's statements and discussions with three of his daughters, Mary, the grantee in the deed: Mrs. Welsh, Mrs. Anderson, and Mr. Thomas, his son-in-law, the draftsman of the deed; the other declarations made after the date of the deed, were made either to Mary Fear or in her presence and hearing, and substantially were that Boston Fear called her "guardeen for the children, or for the property or for both." The testimony is that in all these instances Mary heard these declarations and said nothing, but at times would smile. The plaintiffs offered these statements to show that, by her silent acquiescence, Mary Fear, the grantee, admitted she held the property named in the deed as trustee. The evidence shows she heard them under such circumstances as required her to deny them, if untrue; so that by not denying them, she silently admits their truth. Gittinger vs. McRae, 89 Md. 513 at 517.

If but a few of such statements had been made after the execution of the deed, I would be disposed to hold Mary Fear was not required to deny them, if untrue, but their unusual number, and the fact that Boston Fear was an ignorant, uneducated man, whose use of the word "guardeen" in the interview preceding the date of the execution of the deed, indicates it had a specific and definite meaning to him, which meaning, because of her close association with him Boston Fear knew, and therefore required her denial, if untrue, makes these statements relevant. However, they have so little probative force, that I formed my opinion on the facts by disregarding them, basing such opinion on Boston Fear's undisputed domination of the property, from the date of the deed to his death, and the testimony of what occurred at that interview shortly before the execution of the deed.

The motion, to strike out the testimony admitted subject to exceptions, raises the question, that the Statute of Frauds prohibits the introduction of oral testimony.

The rule governing the introduction of such testimony is stated in Abbott's Civil Jury Trials, 4th Ed., page 515, Sec. 80, as follows:

"Oral evidence is competent to establish a trust, notwithstanding the Statute of Frauds, where its *exclusion* would work a fraud."

In two recent cases our Court of Appeals have applied this rule, viz.: Springer vs. Springer, 144 Md. 465, and Jasinski vs. Stankowski, 145 Md. 53, in this last case that Court, Urner, J., page 62, said:

"The rule in equity always has been that the statute is not allowed as a protection for fraud, or as a means of seducing the unwary into a false confidence, whereby their intentions are betrayed; and parole trusts in real estate have been frequently established in direct contradiction of the statute on the ground of fraud. Constructive trusts are held not within the statute, because they rest in and on the doctrine of estoppel, and the operation of estoppel is never affected by the Statute of Frauds."

In Sec. 39 Cyc. 178, it is said: "The mere violation of a parole promise made by the grantee to the grantor to hold lands in trust or for a certain purpose or to convey it to a person designated by the grantor does not create a constructive trust in the grantee in the absence of fraud in procuring the conveyance; but such a trust will arise when in addition to the breach of the parole agreement there is some element of fraud or bad faith which makes it inequitable that the person committing the fraud or acting in bad faith should hold the legal title absolutely and discharged of any trust."

The testimony excepted to is admissible under the above decisions. As the consideration named in the deed is "five dollars and other good and valuable consideration," the evidence excepted to is admissible under the rule referred to in Heitzman vs. Braecklein, 131 Md. 482, at p. 485:

"Parole evidence is admissible not only to show the real monied consideration of the deed but to show that the same had not been paid. Oral or parol evidence was also admissible to show what was meant by "other good and valuable considerations," or of what these considerations actually consisted, in as much as they are not expressly stated in the assignment. The evidence admitted does not vary or contradict the consideration of the assignment, nor does it set up any new considerations inconsistent with the one therein stated."

While the above named testimony of Mr. Thomas has sufficient probative force to meet the rule set out in 5 Wigmore, Sec. 2498, Note 18 p. 474, that "to establish a parol or constructive trust, there must be convincing proof as leaves no reason for a doubt," the conduct of the parties to the deed after its execution standing alone is "such convincing proof as leaves no reason to doubt" that Boston Fear and his daughter, Mary, knew that the deed was not intended to and did not give her the absolute title to the property therein named. Briefly such conduct is:

A. That after the execution of the deed, Boston Fear maintained the place as a home for himself and his family, just as before its execution; the deed did not change him as the dominating power of the property.

B. His forcing the execution of the deed of trust, over the protest of Mrs. Leckner and of her husband, which dedicated the property towards the payment of his debts, because even if Mrs. Leckner was the nominal debtor, she contracted them in carrying on in her name, her father's building business.

C. Perhaps, most significant of all, when a controversy between Mrs. Leckner's creditors and her trustee under the deed of trust, Judge Carroll T. Bond held that all creditors must be paid promptly; thereafter to raise the money to pay such creditors, and save the home place, on the advice and urgent request of Mrs. Leckner's counsel, to her knowledge and with her consent, several of her sisters bought other properties of the trust estate; one advanced cash towards payment of the debt; none of which would have been done, if Mrs. Leckner had claimed the home place as hers alone. This is particularly important, because done after Boston Fear's death, when, if the deed had been absolute, Mrs. Leckner's sisters would not have had any interest in the home place, and no reason to save it from the creditors, save a desire to help their sister which this case shows was not sufficiently strong to have induced them to buy the other properties and advance the moneys to save the home place.

D. The fact that Mrs. Leckner did not claim the property as her own until after the purchases and advances by her sisters, which saved the place from the creditors.

This continuous and unbroken course of conduct "creates an almost irresistible presumption" that the parties to the deed knew, that while absolute in form, it did not pass an absolute title to Mary Fear.

Duckworth vs. Duckworth, 98 Md. 92, at 99.

I find, therefore, that Mary Fear did not take the absolute fee-simple title to the lands named in the deed to her of November 15th, 1907, and that at the death of her father intestate, the lands vested in his heirs-at-law, then subject to the provisions of the above named deed of trust, but as the trustee has reconveyed them to Mrs. Leckner, she now holds these lands for such heirs-at-law, of which she is one.

The bill asks that the mortgage from Mrs. Leckner and husband to Mr. Edward L. Ward be declared to be a lien only on their interest in the lands.

This mortgage was given to secure (a) moneys advanced to pay off liens on the property; (b) a fee of $5,000 due Mr. Ward and the late Mr. Ruxton M. Ridgely, for services rendered Mrs. Leckner, which were necessary for and resulted in the preservation and protection of the common property.

It is conceded that this mortgage is a valid lien to the extent it secures moneys used for the care and preservation of the property; but it is claimed (1) that no part of the fee of $5,000 for services can be charged against any part of the property save Mrs. Leckner's shares; (2) if the entire property can be charged with the cost of such services, five thousand dollars is more than their fair value.

The services were rendered entirely in the care and preservation of the property; while necessary and valuable, can be charged against the entire property, only on either one of two theories, viz.:

1. That Mrs. Leckner held the property as trustee, and as such, could employ counsel for advice and service necessary or proper in the administration of her trust; or,

2. That she was either a tenant in common or the entire owner of the property; in either case could employ counsel for advice and services in the care and preservation of the property, and charge the reasonable cost thereof on the property.

Mr. Fear's death ended Mary Leckner's estate as trustee, the services were rendered long afterwards, so that as trustee she did not employ Mr. Ward. She did not own the property absolutely, but as a tenant in common; some of the other tenants in common were infants when the services were rendered, so that the question is, had she, as tenant in common, the right to charge the fee for Mr. Ward's services against the *common property?* They can be charged against the common property to the extent that they benefited the then infant tenants in common. Clayton vs. Stein, 135 Md. 689.

In Williams vs. Harlan, 88 Md., at 5, the Court of Appeals held, "when two or more persons are joint owners of real or other property, and one of them in good faith for the joint benefit makes repairs and improvements upon the property, which are permanent, and add a permanent value to the entire estate, equity may not only give him a claim for contribution against the other joint owners with respect to their proportionable shares of the amount expended, but *may also create a lien* as security for such demand upon the undivided shares of the other proprietors." The services rendered come within this rule, which allows Mr. Ward a lien on the common property for such sum as represents the fair value of his services. Through his services, the trustee, Mr. Thomas raised the money necessary to comply with the order of Judge Carroll T. Bond, the sale of the home place was prevented and the resulting loss to the owners saved. The mortgages and encumbrances amount to about $32,000 and the present fair value of the property is not over $50,000. I find that $3,500 (about 20 per cent. of the amount saved) is a proper amount to be charged against the common property for Mr. Ward's services with interest from the date named in the mortgage.

The next question is:

A. What compensation to Mrs. Leckner, if any, can be charged against the property for her services while holding it under the deed in question?

She so held it for ten years and five months, i. e., from November 15th, 1907, the date of the deed to her, until May 19th, 1917, the date of the deed of trust for the benefit of creditors; any service thereafter was that of a tenant in common and of the kind for which, without an agreement with her co-owners, no compensation can be allowed. Ranstead vs. Ranstead, 75 Md. 378.

Until married, Mrs. Leckner was supported and maintained by her father, during which time her father also supported and maintained many of his other children, part of the time his three fatherless grandchildren; he gave a house to some of his daughters on marriage so that his support and maintenance of his daughter Mary should not be set off against her right to compensation while holding the property under the deed; like services were not rendered by any of his children and were such as entitled her to proper compensation.

While their value is hard to fix and the record contains nothing on which that value can be based yet they were of substantial value, subjected her to all the liabilities and duties of an owner (Condon vs. Sprigg, 78 Md. 330), for which I find two thousand dollars is a moderate compensation, i. e., about $16.00 per month for the 125 months of her holding. If the parties do not think this sum a proper allowance, on application I will allow testimony to be taken on this point.

The right to this compensation is denied because Mrs. Leckner claimed the property absolutely; that her so doing was a breach of trust, which deprives her of the right to compensation. She set up the claim of absolute ownership long after she had ceased to hold under the deed to her,

made the claim upon the advice of competent counsel, and cannot be deprived of a compensation earned long before she made the claims.

The last question is:

Should she be allowed as a charge on the land, moneys loaned her father and moneys she advanced for the preservation of the property?

She will be allowed all sums of money she advanced since her father's death for the care, preservation and protection of the property, with interest thereon from the date of each advance.

The testimony concedes her right to the return of the $1,750.00 proceeds of sale of the Charles County farm; I will allow that sum, with interest, as a charge on the land.

The testimony shows, that, with the exception hereinafter named, all moneys she paid for taxes and interest up to and including her father's death, were realized from her father's building business, which he conducted in her name, so she cannot be allowed for such payments.

The moneys she realized from pawning her diamonds, I will allow with interest from the date of the advance; subject to the result of the pending proceedings in another forum in which I am advised the administrator of her father's personal estate is claiming as part of that estate the diamonds she pawned.

I will allow any moneys she paid, since her father's death, for mortgage interest, taxes and fixed charges on the property.

While no claim has been made against her for use and occupation, it may be proper to say that a tenant in common has the right to occupy the common property without being charged therefor. Israel vs. Israel, 30 Md. 120.

I will overrule the exceptions to the testimony of Charles Raith, as to the value of the property in question; his familiarity with the property, his knowledge of it as the husband of one of Boston Fear's daughters and his general real estate experience qualify him as an expert, although no probative weight has been given to his testimony as to value.

I will sign a decree in accordance herewith. ·